The Oregon Board of Parole violated Mr. Green's rights under the federal ex post facto guarantee by expressly applying a law enacted after his offenses to deny his release on parole in 1994. Under the new law, the board no longer had to rely exclusively on the determination of the examining psychologist appointed himself by the board in determining whether or not Mr. Green should be released. The board could now pick any number of reasons, as it did in this case, and from a wider pool of information to deny release. We see that happening both from the board action form, in this case, and from the transcript of the hearing itself. The board action form. The question is whether it was really a substantive change in the law. Obviously, everybody thought it was in 1993, but was it in fact? It was in fact. What the district court did is, in essence, just examine the law and determine itself that the board always had that authority to examine greater information than the psychologist's report. How do you get that out of the actual wording of the statute? It's very hard to get that out of it. Well, I think that the. It seems quite clear. I think I would respectfully disagree that it is quite clear, and I believe that the Supreme Court's directive in Garner v. Jones supplies the answer. In that case, the Court reversed the Eleventh Circuit's decision in an ex post facto case because it did not properly give effect and analyze the policy statement issued itself by the Board of Parole in Georgia in that case. Well, we have policy statements. Plus, we have the policy statements from the chair of the board. Well, one other question that really is. What do we know about what the board was doing in 1985? How do we know what we know? We know in 1993 that some people. And I think there's a statute in some way that's very hard to figure out how they were reading it, why they were reading it that way. But what about at the time? Well, what we know is that we have information about the practices prior to 1993, and there's no expressions to the legislature in the board's policy statements or memoranda saying, well, we originally were applying it as the respondent contends. Then a different interpretation held sway for a certain number of years. And now, unfortunately, we're back to the 1985 practice. I believe that perhaps a examination of the parole transcripts, like we have in this case from 1985, might supply greater information. I guess you have to show not only that there was a change, but that the change would have affected your client. And I thought, and correct me if I'm wrong, but I thought that the opinion on which you relied said he still has this personality disorder. He's still got the same condition he had before. It's not in remission, and it hasn't disappeared. But in my opinion, he's no longer dangerous. Now, that's how I read it. It seems to me that whatever change, even if they're bound by the report, it's not a report that the condition that made him dangerous is in remission or is cured or anything. Well, I think the report is multifaceted, but it is definitely a very favorable report. The psychologist determines that he is no longer a dangerous offender. It determines that he does not have a severe personality disorder and says, quote, nor does he have severe mental problems. It says that the antipersonality disorder shows up on the MMPI-2, but it is substantially reduced. Well, it's still there. It's still there, but there's a favorable report regarding the progress he has made in overcoming this his earlier psychological problems. And in its basic irreducible psychiatric diagnosis or psychological diagnosis, and that is that the mental health problems that he previously suffered were largely in abeyance. The severity had diminished considerably. And all he had in terms of a mental health problem was that demonstration of some degree of antisocial personality disorder in the MMPI. I have two questions. One, in looking at the original statute, what in it says that this obligation to determine, make that determination is handed over to some psychiatrist we don't even know about? Your Honor, the analysis requires a side by side comparison of the prior law, which speaks in terms of whether there or not there isn't. No, no. I just want to address the first the first statute. I see nothing in there that says that the board's responsibility is now handed over to whoever, whatever psychiatrist happens to be called before them. And that's why we have to under Garner versus Jones. It also says for the parole consideration hearing, the boards are called to be brought forward and consider all information regarding such person. The information shall include the written report, another report by the Department of Corrections, a detailed account of the person's conduct, a statement of the person's present attitude. What were they supposed to be doing with all this information? It says specifically they're supposed to use it. And the district court itself, in analyzing this, found it a mystery why the board had interpreted it differently. But that is exactly what it had done. The board did? What is the evidence in the interpretation? The evidence, the interpretation is in the excerpt of record at pages 14 through 22, where we supply the policy statements memoranda by former chairs of the board regarding what the law actually required. That leads into my second question. Suppose that the board has misinterpreted the statute, which it appears to me it did. Is that a basis for ex post facto analysis? Your Honor, I submit that the answer is yes, and that in Respondent's Brief on page 26, they cite this Court's decision in Smith v. U.S. Parole Commission. And with the Court's permission, I just want to read one sentence from that that sets forth the standard and addresses Your Honor's question. It states that the operative factor in assessing whether a directive constitutes a law for ex post facto purposes is the discretion that the board retains to modify that directive or to ignore it altogether as the circumstances may require. And in this case, we know unmistakably that the board couldn't just ignore it, that it wasn't. It wasn't written down anyway. There was no directive. The directives were the statements from the board chairs themselves as to what. But they didn't. And that's the key, Your Honor. Instead of coming in and changing it, if it was simply just their prerogative to do so, they took a far. Change what? Change an earlier interpretation of the law. Where was it set down? Where was the interpretation set down? The interpretation was in the, was just that. It was an interpretation as embodied and as we see from these memoranda. But it's no directive or regulation, is it? It's not a regulation. I see a letter from a House member that says, you know, using it as a political issue. But. Well, I think that what's key is that the. Is that the board goes to the legislature and says, we don't have this discretion. Suppose we have an interpretation of the federal situation. And the Ninth Circuit has an interpretation of the sentencing guidelines. It's favorable to the defendant. And it's in effect at the time that he is convicted. And five years later, the Supreme Court, as it's described, reverses and says that we're wrong. And actually, the rule is much less favorable to the defendant. Well, if there was a later Supreme Court determination, then that inter. I think that's different because the latest Supreme Court decision would be deciding what the law had always required, whether in the meaning of the law. Why isn't that enough? I submit that it's just irreconcilable that the board could just simply change it at its will or issue regulations if they felt the necessity to go before the legislature and get a new statute that rewords it and reconfigures the authority from the treatment professional to itself. And we see that in the change in the language. Okay. You have extra time. Thank you, Your Honor. Thank you. May it please the Court? Tim Sylvester from the appellee in this case. I think it might be helpful to clarify one point. This particular issue has arisen in the context of two different statutes that are kind of companion statutes. One is 144.125. And then the statute that we're talking about here is 144.228, which deals with dangerous offenders. 125 is the general statute that involves paroles for other people. The statutes are worded differently. The issue that is presented in this case also has risen in the context of the other case because that statute is a little bit more ambiguous. The statute in this case, as Judge Hogg has pointed out, is fairly clear on its face. It does not in any sense by the language of the statute require the board to defer to the treating psychologist. The statute in the other case arguably may. And so a lot of the litigation that has gone on in state courts on this has involved the other statute or the two of them. And I think what was going on is back in about early 90s, there became a confusion about whether, with respect to the other statute, the Board of Parole had to defer. And that ultimately was resolved in the Widener case that I talk about in my brief. And the reason I talk about that is that's the other shoe in this case. But in that case, the Oregon Court of Appeals said no. That statute, as originally was enacted, did not require the board. They were both changed at the same time. That's correct. But it was the same sort of expos facto challenge. But the two statutes were amended by the same House bill. And so a lot of the legislative history that Petitioner points out, there's discussion about both of them. But I think for purposes of this case, the shorter answer is that there's nothing that I'm aware of that shows that back in 1985, when Petitioner committed his crime, there was any Board of Parole. The Board of Parole has authority to enact rules and regulations to guide its discretion and that sort of thing. There was never any rule on this. There was never any stated policy position on this. As far as I'm aware, too, there was no series of opinions that the Board of Parole issued back in 1985 that anybody could have pointed to to say that the board views this as being the psychiatrist's. Was there an opinion of a counsel to the board? Well, I think that there was when it came time. Is that in the record? Well, I think that there, and I can't remember precisely what's in there. There's some statements that were going on during the enactment of House Bill 2487 in 1993 that there was a substantial concern whether this statute did require the board to defer. And so what was going on, essentially, is they're saying, well, let's solve this problem by enacting this. But there was a reference to advising counsel. The reason they had taken this position was to advise counsel. Yeah, that's true. There was a statement. I'm sorry if I misunderstood your question. There was a statement, and I think some general counsel lawyer may have said something to the Board of Parole or they may have misinterpreted it. I'm not aware of any formal opinion by counsel. Well, there are references to it, but you don't know of any written opinion. No, I'm not aware of any written opinion. And this often happens in state government. Sometimes things are misinterpreted. If they had written a regulation saying this in 1985 or before 1985, then there would be a problem. There would be a problem. I don't have any disagreement with that. If the Board of Parole issued a rule that says this looks... Let's take a counterintuitive defendant who says, before I commit this crime, I'm going to go find out... That's part of the theory of the ex post facto. Yes, as the Supreme Court just recently reiterated. Right. So he goes to his lawyer and says, you know, what's going to happen to me? And the lawyer says, well, we're now assuming that this was in fact in 1985, which we don't know. You know, I've researched it, and this is the interpretation of the Board, and that's what's going to happen. Now, why should it be different if that versus a regulation which they can change a rule on? Well, I think a little bit of it depends upon, as you were using the hypothetical, if this court were to say something, the U.S. Supreme Court would say, no, that's wrong. You just don't have the right to rely on something unless the person who is making the decision has the authority to make that decision and have it be final. Now, if the Board... I think there would be a problem if they had the authority to issue that, and they in fact did, and that regulation in fact was within their statutory authority. But if they adopted a regulation, for example, that said black is white, and then in a later appeal, you know, the Oregon Court of Appeals said, well, you know, sure, you said black is white, but that is not what the law is. Then I don't think that the fact that the Board had adopted a rule that ended up being overturned as beyond its authority by an appellate court would be a law for ex post facto purposes any more than this Court's determination of the rule of sentencing guidelines would be the law if the Supreme Court later on overturns it. But you don't even have that in this case. I mean, you don't even have a formal board order or a formal board rule that has interpreted the statute as requiring it to defer to the treating psychologist. But even if, say, the Board of Parole in 1985 had adopted such a rule and Petitioner had gone off and committed his crime in reliance on that rule, it still would have been within the prerogative of the State to challenge the Board's however it would have come up, challenge the Board's rule as being beyond the scope of its authority under the statute. And if the Oregon Court of Appeals had said, yes, you cannot or this statute does not require you to defer and your rule in that respect is wrong, then I don't think that that particular rule even in that situation would be a law for ex post facto purposes. And that's effectively what kind of happened in this case, is the Board of Parole in Petitioner's case said that we are applying 2487, we're applying the new law to you and you lose. And he went up on appeal and said, no, the Board of Parole can't do that because they had previously issued statements that they felt they had to defer and the State, before the Oregon Court of Appeals, our entire argument was, that's not right, the statute doesn't require that, and so to the extent that the Board of Parole may have said that, that is not with the law in the State of Oregon. Once again, no one's told us anything. Pardon me? Once again, the Court of Appeals didn't bother us. Yeah, the Court of Appeals unfortunately awafts a lot of cases, and so the Court of Appeals affirmed that... That's interesting, I didn't think they would have done something. You know, they have decided the same issue in Widener, and that's the one I cited in my brief where they said, no, there is not this required deference. Now, the statutes are different, the language is different, and so Widener isn't precisely on point, but it does indicate the Court of Appeals' opinion that just as a matter of policy, I think as Judge Hugg was suggesting, an administrative agency should not be required, is not required to defer to a private treaty. What about the discussion in Garner? In what respect? With regard to the policy. Well, there was discussion in Garner saying that they should have taken the policy pronouncements into account. Would you say it's different because it was more of a written down? These were not formal policy statements by the board. There was never, I mean, there's nothing in this record to suggest that the board, as a board, ever made any sort of policy determinations on the application of this statute. There's no rule, there's no order, there's no policy, written policy statement. Well, there is something to indicate it. I mean, the board chairman or members specifically said it in this legislative process, and no one seemed to doubt it. Well, he said that, yes, but, again, it was not a formal, and it has to be construed in context, too, where what you were doing is you were taking a bill through the legislature in order to fix a problem that they perceived to be there. But, in any event, to the extent that the board may have adopted some policy that would be a law for purposes of ex post facto, all Petitioner can point to is something that happened in 1993, which was eight years after he had committed his crime. So I don't think that whether the board had adopted policy in 1993 would be a law for ex post facto purposes that would apply retroactively back to the date he committed a crime in 1985, unless the court has questions, that's all I have. Thank you. The case just argued is submitted for decision. The next two cases, United States v. Kohlenbaum, please, and Burgess v. Cook are submitted on the briefs, and we'll hear the next case for argument, United States v. Harpoon. Good morning. Kelly Beckley appearing for the Petitioner Appellate. Mr. Harpine, may it please the Court and Counsel, I'd like to reserve about ten minutes of my time for rebuttal. I think it's first, there are a number of facts in this case, the operative facts span over a period of more than ten years, and so without repeating what is in the briefing, I would like to focus on a couple of important facts in the timetable because I think it's critical to an understanding of the issues in the case. Mr. Harpine was indicted in October of 1991. However, he did not get back to the United States. He was being held in Canada until 1996. So his case in the U.S. starts in 1996. His case is being prosecuted by Assistant United States Attorney Frank Papagni, who is also the prosecutor in the Estegard case. The Estegard case was a drug case, also involved a gun count, and Mr. Estegard retained Sean McRae, the trial counsel in Mr. Harpine's case, in July of 1993. In March of 1994, trial counsel McRae withdrew in Estegard's case. So the Estegard case starts after Mr. Harpine's case, but Mr. Harpine, the active prosecution of Mr. Harpine's case, hasn't started yet by the time Ms. McRae has withdrawn. In October of 1994, and then again in February and October of 1994, Ms. McRae was subpoenaed before the federal grand jury to testify about a money laundering investigation. At some later point, it became apparent that not only was she a witness, but she was a potential target in that money laundering investigation. At what point? Does that matter at what point? Well, in fact, I think the record is somewhat unclear on that, because what the government is arguing in this case is, well, it was a different office of the Department of Justice that actually completed this case, and the case actually became a civil case and was completed in March of 1999. It resulted in a civil action being filed against McRae alleging one count of money laundering and one count of conspiracy to commit money laundering, and in May of 2000, the final settlement agreement was reached and the civil case was dismissed with trial counsel agreeing to pay some, I believe the sum was $22,000 and so on. If I may ask you more specifically, is it the time of McRae's representation of Harvey, does the record indicate that she had become a target rather than a witness? That's my understanding. And what is that understanding based on? Well, it's based on, I guess, in the record, in the excerpt of record, there is a long settlement document that sets forth the facts that give rise to the civil settlement. One of the issues in this case, and the court's question brings into focus one of the principal legal issues in the case, which is the fact that the court should have granted an evidentiary hearing once Mr. Harpine filed the petition that was denied in this case. The court did not grant an evidentiary hearing to determine some of these facts. In other words, we have this, you know, we have essentially the equivalent of the 18-minute gap here between 1994 when Ms. McRae is called before the grand jury to testify in this money laundering case. We know she's under investigation during this entire five-year period, and it ultimately results in a civil disposition in 2000 after the filing of the case. What you're saying is that you can't tell from the record, and that's why you didn't hear it. Not that it's in the record, but we know that she wasn't at the beginning, that she was at the end, and this was in the middle, and we don't know when in the middle she became, and that's why we didn't hear it. That's one of the arguments, Your Honor. Yes, correct. We need a hearing to do what? To flesh out. The fundamental is... Flesh out. What is the allegation that we have a hearing for? Whether or not, you know, fundamental to a defendant's right to effective assistance of counsel under the Sixth Amendment is conflict-free assistance of counsel. And the cases Mickens discusses a number, Wood and Sullivan and Holloway, which say a defendant has a right to a lawyer Yeah, I understand that. I understand that. But you also do not have a right to come in and say, I think that there may have been a conflict because this happened, therefore I get to have a hearing in order to inquire about everything this person has done to see whether there might be some conflict. Well, that's not really what we're suggesting, Your Honor. Well, what is the allegation that you wish to prove at the hearing? That her ability to provide conflict-free, competent representation to Mr. Harpine was compromised for the fact during the same time that she was representing him, she was herself a target of a criminal investigation. The same lawyer who was prosecuting Mr. Harpine was investigating this case. We know at some point Mr. Papagni passed the wand to somebody in the Civil Division of the Department of Justice when they filed in 1999 a civil case alleging violation of these criminal statutes. What is the conflict? What is it that she would have done that you think that she did as a result or didn't do as a result of this conflict? She's in a position where she's unable to give unfettered... Well, then you don't need a hearing for that. ...competent assistance to her client because she herself is under investigation and the case is discussed. Aren't you asking for a holding that was a matter of law that because this was happening she was unable to give unfettered? Well, we think that there is some support for that position, but as a fallback position we think without question the court should have, first of all the court should have made inquiry into whether or not there was a conflict between Ms. McCrae's representation of Harpine and her own difficulties. That's one. Let's assume that the hearing would demonstrate that she became a target at some earlier point and let's assume that that would be an act of conflict. But in order to trigger, the standard as to whether you're entitled to a hearing is whether the record conclusively shows that you're not entitled to relief and under Mickens and earlier cases you need to demonstrate some effect, and I'm afraid there's an effect on representation. Have you done that? Well, it's difficult to do that in a void because, again, the record is, and I might indicate I'm laboring under a bit of a disability here since I wasn't representing Mr. Harpine at any stage. He's actually had, I think, two or three lawyers in the 2255 process. But what I would point out to the court is there is no ability to know, without the evidentiary hearing, exactly how she might have been constrained in her duty of loyalty, conflict-free loyalty to Mr. Harpine. He only learned of the fact that she was herself under a federal criminal investigation for money laundering after he'd been convicted, I think during the process of his direct appeal in about 2000, if my memory serves me correctly. If the hearing was to determine what effect it had on the ultimate conviction, would there really be any point since Judge Hogan heard the trial, he heard everything about it, I mean, what would be presented at the hearing that would be different with regard to the type of representation that was given? An example, and obviously I'm speculating, and I think the court's inviting that, an example might be if during the time that trial counsel is representing Mr. Harpine, she is also negotiating with the U.S. Attorney's Office to resolve her own criminal difficulties. That resolution eventually results in a civil disposition of a case that well could have resulted in indictment. So this hearing is limited only by your own imagination? Is that what you might want to prove? Well, I don't think so. First of all, I think that it would be pretty easy to examine. First of all, Mr. Papagni wasn't... I wonder if I could interrupt you just a second. Isn't what you were just saying in response to my and Judge Schroeder's question was that all has to do with whether there's a conflict, but there's a second prong. Even if there is a conflict, and I'm concerned with the second prong, even if there is a conflict, the hearing would have to do with whether there was appropriate representation. And Judge Hogan was there, saw the whole trial. And so on the second prong, how do you win? Well, if she was so... if there was an actual conflict, I think the case law is pretty clear. If there's an actual conflict, the Sullivan case stands for the proposition that the adequacy of representation need not demonstrate prejudice to obtain relief. In other words, if... Demonstrate. This is what we're looking for in the same circle. You still need to demonstrate an effect on the representation. It's very fine-cut and a little bit unusual in the sense of how we usually think about conflicts. But as I understand what the court's now telling us is that you don't have to demonstrate for... You have to demonstrate that she did put on a witness she wouldn't have put on. You don't have to demonstrate that would have made a difference. But you have to demonstrate that she didn't put on a witness she would have put on, for example. Now, what of that character or any other character, and why do you need a hearing about that? May it please the Court, it's not confined to actually what went on in the trial. I understand. It is the entire panoply of the representation, from pre-bargaining to discovery to trial to representation in the appellate stage of the case. Do you think the court has no obligation prior to getting a hearing to make any demonstration to meet that promise? Is that what you're saying? I guess I'd invite the court, and I know this isn't terribly persuasive authority because it's from a different circuit, but it's cited in our brief, the Briglio case, where the facts are really strikingly similar in the sense that, and the court found that there was essentially not enough information in the record to decide whether or not there was conflict-free representation that didn't affect the outcome. And basically, the court remanded the case back to the district court for exactly what we're asking for, for more discovery and for a hearing on the issue, an evidentiary issue, to examine the issues, whether there was an actual conflict, whether there was an actual effect on the adequacy of representation, and whether there was prejudice. Now, I will admit that this is a Third Circuit case, and I will admit that this case was decided before Mickens. All right. The next and last sentence in Briglio is, the showing made by Briglio raises a clear possibility of actual conflict, actual effect on the adequacy of representation and prejudice. So there was apparently something in the record from which you could surmise that there was a clear possibility of actual effect on the adequacy of representation. That's what we're asking for back now. I understand that. And what I'm suggesting to the court is the mere fact that we have a criminal defense lawyer herself under investigation by the same office, by the same prosecutor, it raises the specter that someone is not going to give their 100 percent best, So you would have the power to subpoena anybody that you can think of to bring up and ask questions. Is that essential? Well, I don't. To see if maybe there's something that had some effect. It seems to me that it would be a lot more narrowly focused than that, but it seems to me that clearly the lawyers from the U.S. Attorney's Office that were involved in both the criminal investigation and the civil investigation, Mr. Harfine's former counsel herself, at a minimum, it would seem to me that those people could shed a lot of light on the chronology that is not a part of this record. We just simply don't know. Mr. Harfine's lawyer, Alonzo Hatch, did raise a theory that it may have given us a hint at some point, is that right? That's correct. I believe at some point there were about seven different issues of ineffective counsel that ineffective assistance of counsel raised. However, at this point, those have been winnowed down simply to the one that we're talking about right now, which is the conflict issue. I guess I had a second point, which was that presumably the ineffectiveness allegations are allegations that she did something wrong at the trial that she was presumed to have to prove in order to prove that there was an effect of the conflict. In other words, for example, I gather that there was an intention that she failed to challenge the efficiency of the indictment. That raises an ineffectiveness claim. Yes. Now, I suppose, hypothetically, you could claim that she did that because she was conflicted. You could, I suppose. But I think the more to the point issue is that maybe the trial isn't the part that is the most important to look at. Maybe it's the negotiation process. Maybe it's the discovery process. There is an issue regarding Apprendi, which is. Which is. I particular. And Nickens talks about, you know, most of the cases that arise in this context are when a lawyer is representing two clients. That perhaps have conflicting interests, which is which is pretty insidious. But we have we have a situation that I submit to the court is even more important here where a lawyer's own personal interest is at conflict with representing their client. I submit to the court that this is a more profound conflict than the one that exists when a lawyer represents two or more clients with potentially conflicting interests. We have only about two minutes. I know that. Thank you. My name is Frank Bagni. I was the prosecutor. Mr. Harbine, assistant U.S. attorney. If you could keep your voice up. I'll try to do that for you. There are a couple of factual issues that Mr. Beckley, I think, was mistaken on. I don't believe Mr. McRae was ever received or designated as a target of the investigation. I think my brief, as well as my pleadings below, which are attached to the record, explains the case chronology in some detail. Mr. Harbine was indicted in October of 91. He left for Canada with a federal search warrant in hand, confined some Canadian citizens to the internet country, and ended up doing four years in Canada before he was returned to the United States for prosecution in 1996. In the interim, Mr. Estegard was prosecuted by myself for drug trafficking. He had retained Ms. McRae to represent him in the drug trafficking charge, and during the course of that pretrial proceedings it became apparent to me through a couple of informants that Mr. Estegard had given the okay for these informants to give some money, although at the time all we knew, it was a diaper bag containing videocassette containers that the informants had said contained cash, but they said they had not told Ms. McRae it did. Once we began to look and try to track down the money or follow the money, at that point Ms. McRae withdrew from the case, which had been in March of 94. She was replaced by two other lawyers. In September of 94, after I received permission from the Assistant Attorney General, Ms. McRae received a subpoena to appear before the grand jury, the purpose being trying to find the money. As indicated in my affidavit... But at some point between 94 and 99 she became a target. I don't agree with that. She became the subject of... Subject is correct. But whether you call her a target in a technical sense of a criminal prosecution, she was not in fact a criminal prosecutor, but she certainly wasn't in a position to have a conflict of interest at some point. We don't know what that point was. What happened was this, and that's why I was going through the chronology. When it became apparent to me in November of 94, even more apparent after the sentencing of Mr. Estegard, that was in November before his sentencing, I took myself off the case because I became a witness as opposed to a prosecutor. That's significant in our analysis of conflict, because at that particular point, contrary to what Mr. Beckley is saying, is that she was not being prosecuted by the same lawyers. At that point, my obligation was to get off the case and let someone else, preferably another office, in this case we used the Maine Justice back in D.C., take the case and the assistance of civil attorneys in our office here in Portland, as well as a civil attorney in our office in Eugene. If you will, I became smart enough, if you want, to create a screen. And the purpose of that was to avoid, perhaps not successfully, what we have here today. In the interim, what happened was, is Ms. McRae, who was represented by her father, also a lawyer, was under investigation, if you will, as a subject. If you want to designate her a target, that's fine. But the point was, she was under investigation in that matter. It was ongoing for five years. How she would curry favor of psychological influence over what she was doing at Harpine is belied by what Judge Hugg was referring to, and that is Judge Hogan's examination, as well as mine, including in my excerpt of record, the trial we had in Harpine. As far as the ineffective assistance of counsel claims other than the conflict, that is addressed in my excerpt of record, pages 38 through 47, which where he makes these vague, conclusive allegations that somehow Ms. McRae didn't do her job right for him. What I'm suggesting to this Court, and what Mickens made clear to this Court, is that we first have two prongs to look at. A potential conflict of interest, even if we don't have an evidentiary hearing, is not sufficient to grant habeas relief to a federal defendant. What we have to look at is, was what happened here, did it undermine the reliability or the confidence you'd have in the verdict? Now, if you go through this record, if you look at... Well, that's not true. That is not what I understand in Mickens' case. Well, I'm referring to page, Judge Scalia's opinion, page 1241. That's in the Mickens case. It's 122, Supreme Court, page 1241. And it talks about the exception to the general rule. We have spared the defendant in need of showing probable effect upon the outcome and have simply presumed such effect where the assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. But Judge Scalia goes on to say, but only in circumstances of that magnitude do we forego the individual inquiry where the counsel's inadequate performance undermined the reliability of the verdict, citing Cronick at page 659. What the question was in Mickens, as this Court recalls, this question was addressed, specifically referred to, excuse me, by Judge ‑‑ Is that essentially the Strickland standard? Yes. My understanding of Mickens is that you're not incorporating the, that there's an intermediate standard, which is not the Strickland standard. You don't have to undermine the reliability of the verdict, but you do have to demonstrate that there was some actual impact on the way the person behaved in the trial. Well, the holding in Mickens, as I understand it, was in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known. And keep in mind, in this instance, Judge Hogan has already ruled in his order that he didn't think there was any potential conflict of interest. But even if he should have so found, a defendant must establish the conflict of interest adversely affected his counsel's performance. Right. Exactly. And what I'm saying here is ‑‑ That's very different to what you were saying before. I'm sorry. If I did, I was mistaken because what I'm saying here is if you look at what Ms. McRae did with her pretrial preparation, her pretrial motions, her motions to suppress statements, her motions to suppress the search warrant, her Franks hearing, her motion to get witness fees, her motions as motions ‑‑ Speculation? No. What I was going to say is that there were a bunch of allegations of ineffectiveness. And Judge Hogan's conclusion, I gather, wasn't that these things didn't happen, but they weren't ineffective. I.e., she didn't ‑‑ I have no idea whether any of this would hook up. It probably wouldn't. But call witnesses to impeach government witnesses. Ask for a continuance or a change of venue. But let's assume that she didn't ask for a continuance because this is very far‑fetched. Well, as a matter of fact, she did ask for several. But go ahead. Okay. So maybe these allegations are wrong because it just didn't happen. Suppose it didn't happen. And there was some way to tie it into her contract. I gather that would be sufficient evidence. I don't know that it would. I think that you folks are directing questions to my colleague and friend, Mr. Beckley, saying that's speculation. And I don't know if that's what you want to enter into here. But what I think what you're trying to address is, was there something that has been pointed to by Mr. Harpine in the record which would say, and the answer to that is, I have yet to find it. Judge Hogan certainly did not find it, if you do not wish to take my representation as the government's attorney here. So you have to look through this rather large record. You have to look at how she handled her pretrial work. You look at the way she handled her trial work. You look at her objections A through, I think, double F to the sentencing. You look at the fact that she managed to reduce her client's sentencing, although this was a substantial sentence for the reasons given by Judge Hogan. She succeeded in reducing the amount of kilograms of methamphetamine attributable to him from 88 down to 10 to 30. That had quite an effect upon the guidelines, to say the least. She went ahead and handled the appeal and raised some of the issues, which he claims in his ineffective assistance of counsel pleading, Frosay pleadings, that she didn't do her job right. And yet this court looked at those before on direct appeal and rejected them. In fact, this court indicated on direct appeal that even looking at the evidence tonight most favorable to the government, there was no doubt that there was sufficient evidence here. And that's the other prong of my argument to this court in the time I have allotted. In this case, Judge Hogan pointed out, we look at a couple of factors that I think are significant in determining about the trustworthiness of the verdict. His wife testified against him after she was given a deal by the government. His chemist, who was educated in Syracuse, and by the way was very well educated in making meth, he testified against him and he got his sentence reduced from 188 months to about 150-something. Plus he got a different place to stay in prison. But you think those are two informants, those are two snitches. We also had his fingerprints on the laboratory equipment, independent cooperation. We also had the fact that he admitted in Canada to a Royal Canadian Mounted Police officer, I believe it was Inspector Greger, that he in fact had the... Isn't it true that under the chronic line of cases that none of this would matter? If... You were able to prove... The whole point is that you're back at the prejudice level and the whole point of a chronic analysis, even as I mentioned by Mickens, is you don't have prejudice analysis. I'm arguing, if you will, and I concur with you, that your observation is correct. My argument that I'm making under Mickens is looking at the fact of how does, ultimately in a habeas as we see this, how did this affect, how did her, how did she perform? Was her performance adversely affected by this other investigation into another case involving her handling of her client's money and her payment there? Did that somehow adversely affect how she handled Mr. Harfine's case? You're just trying to prove that he was really guilty, but what does that have to do with anything? Pardon me? You're now trying to prove that he was really guilty. I'm saying that this is what she was up against when you're evaluating her performance, and I suppose that's something that's a factor that goes into the analysis, at least I get that impression from reading the Mickens case closely, and the concurring opinions of Justice O'Connor written by Justice Kennedy. So these are things that I think you put in, if you will, into the mix. I don't question the analytical framework that we have to go through here. It certainly changed after Mickens, I don't think there's any doubt about that. The split in the circuits was resolved there. These are the points I wanted to make. I expect that there might be some more concern about an evidentiary hearing that you might want to address, but I think Judge Hogan handled that rather well in the way he said that he sat through this trial, he watched her performance, he dealt with these issues. Mr. Harpine, I used some portions of the record for your review, including his sentencing colloquy, to indicate, if you will, the consultation that went on between counsel and her client, trying to show that there did not seem to be any shortcomings by Ms. McRae for whatever was going on, on this other case, the Estegard case being handled by the Civil Division. I don't know that it was being handled by any criminal division after I got rid of the case. That isn't to say that they weren't looking at that aspect. I do distinguish this case from the case cited by Mr. Brackley, the Briglio case, because in that instance there was the comparison showing that the defense attorney was aggressive and showed no signs of conflict in his performance, but there was a need for an evidentiary hearing. But the point in that instance is that in that case the defendant was, if you will, the attorney was indicted and faced criminal charges. That never occurred here. There was no indictment. There was no criminal complaint. Pardon me? What difference could that make if she wasn't indicted and didn't face criminal charges? It would show that the- She was charged in a civil corporate charge. She did cost $20,000. It's a matter of degree. I think that if you're facing a loss of your liberty, as we hear sometimes defense lawyers talk, that's far more significant than a loss of cash. But certainly either would be a basis to claim a conflict. I don't deny that potential exists. But what I'm trying to point out here is the difference between the two types of cases that we had in the Third Circuit in 1982 as opposed to what we have in this instance. I know that I have more time, but I don't know that I want to use it unless there's a need. Besides that, my voice is giving way. Thank you. Thank you. I have very little to add. I'll try to answer any other questions the Court might have. Would it have made any difference if Mr. Hoffman hadn't told about this issue? I think it certainly gets much closer to whether he knowledgeably- or inquire further into the potential conflict. I might address one issue that I think has been raised by the Court's comments and by some things that Mr. Pagni has said, and I'm referring now to page 152 of the Government Supplemental Excerpt of Record, Volume 1. This is the last page of Judge Hogan's order where he denies the motion. And he basically says that he didn't make an inquiry into the allegations and the factual circumstances of the alleged conflict because he didn't perceive it to be a conflict. And essentially, I guess what that goes to is that no inquiry was made by a judicial officer about this potential conflict. It wasn't revealed to Mr. Harpine. It's only after he has been represented by Ms. McCrae for a substantial period of time, through the appellate process, that he becomes aware of it and has no opportunity to inquire whether there are facts that support his belief that she had a conflict in representing him. Thank you.
judges: Schroeder, Hug, Berzon